Thank you, Mr. Whitley. Morning, Your Honors. Are you able to hear me? Yes. Yes, I can. or a well-founded fear of future persecution, either of which merits asylum under the controlling totality of the circumstances test. As a matter of law, the undisputed facts here do warrant asylum, but the immigration judge and the Board of Immigration Appeals misapplied the law to this undisputed constellation of facts. The decisions below erroneously minimize a factual record that shows an escalating persecution of a political journalist as merely two unlawful detentions and a beating, which knocked the man unconscious, for merely associating with journalists. But the undisputed facts show much more than that. Not only was Mr. Martinez twice jailed without charge and beaten unconscious on the street by government agents, he also showed an inability to earn a living, he showed an inability to relocate within Cuba, and he showed the inability to permissibly travel outside of Cuba. And all of them were connected to his political journalism. The immigration judge, however, treated Mr. Martinez as someone who was merely associated with journalists and not himself a journalist. The court wrote, and I'll quote here, that there is, quote, excuse me, there is, quote, no evidence that the Cuban government recognizes him as an opposition party journalist, close quote. The record disproves that. If that's a factual finding, it's a clearly erroneous factual finding. Because the record is clear that in November of 2015, at the outset of the sustained government campaign to repeatedly harm Mr. Martinez, it was the head of the local committee to defend the revolution, a powerful communist group that closely regulates behavior community by community. The head of the CDR personally told Mr. Martinez to stop writing for the online opposition magazine. It is not a case as to someone who is merely suspected of being friends with journalists. He was instructed by a powerful communist official, stop writing for this political dissident magazine. If we agree with you that the immigration judge and the BIA didn't adequately consider the evidence presented that Cuban officials thought he was a dissident writer, you're asking us to address a purely legal question, find these uncontested facts, establish persecution past or future as a matter of law. Why wouldn't we just send it back and say you tell the immigration judge, the BIA, that they have not adequately considered the evidence and just remanded? Well, I believe it's because it presents a purely legal question de novo. I believe because the facts are undisputed. Certainly, it's a matter of the court's determination whether it remands. But I don't believe a remand that allows only one answer would be the most prudent course. We believe that the law compels and the 11th Circuit in prior cases has found. Now, it's found also in the context of reversals that as a matter of law, the facts compel a granting of asylum. We believe that is the case here. And to merely remand and say we want you to look at this more closely would only invite a second error if, in fact, the facts, as we believe, do show entitlement to asylum. And again, the point I would like to emphasize is that the clear error here was not applying a totality of the circumstances test. The court refers to the incidents of abuse and harm that Mr. Martinez experienced as isolated. For me, an isolated event happens once or perhaps twice and separated by a great deal of time and unrelated to each other. This is a series of event after event after event escalating in seriousness that are all connected to his activities as a political journalist. And the lower courts concede, as they must, that dissident political journalists are heavily persecuted in Cuba. And it seems they've sort of gotten off track by creating this subgroup and saying, well, Mr. Martinez, he's not in that group. He's just in the group of people who associate with journalists. And that's not a protected group. And that's simply erroneous, because, again, the facts, as accepted by the government in their own brief and as testified by Mr. Martinez and the judge was emphatic in explaining how credible and how admirable Mr. Martinez was, found he was told stop writing for this magazine. That is journalism. And the evidence that the court on his economic inability. First of all, the immigration judge completely missed the factual record in saying he merely lost one job that after running into trouble with the government, he lost a job as a waiter. The testimony in which the the immigration board on appeal recognized, they said, well, in fact, he was fired from three straight jobs as a waiter in quick succession. He had a job. The communist officials told his employer, get rid of this guy because of his political problems. And he found a new job. He testified he's an excellent waiter. He knows multiple languages. He was fired from that job for the same reason. He found a third job. The government again went to that employer, said, no, this guy you don't hire. That's evidence of inability to earn a living. On top of that, he then relocated. He said, OK, I clearly have a problem with the government officials here. I'm going to move to another part of Cuba. He moves to a place I believe is called Consolation. And there he is arrested and held without charge for three days by government officials who again threaten him. As with his first detention, he's threatened with torture. He's threatened with death. And he's ultimately released and he's told you have political problems in your hometown. You're not welcome here. Go back to where you came from. He then tries to emigrate lawfully out of Cuba. He has his laptop confiscated. He has a cell phone confiscated at the airport. These are the critical tools of a journalist. He's told you are a national security threat. Now, the man is a waiter. It's unclear what else that could possibly be referring to. But his political journalism, his things are confiscated. He's sent back home. And ultimately, he flees the country. And the record is somewhat ambiguous. But it sounds like he has help from friends to unlawfully escape from Cuba. But there is no reasonable fact finder that could say that his fear of future persecution, while accepted as subjectively sincere and accepted as fully credible, no one could find that it's unreasonable. There is a reasonable fear of future persecution upon return to Cuba. And for that reason, we believe this constellation of facts compels the result that he is entitled to asylum. And as one final point, I think the government's choice of case law is particularly instructive. Both the court, the government and ourselves in our brief, we all point to the Janda case of a detainee in the African nation of Togo. And he was held and beaten by police. He suffered injury. In that case, it was ultimately found, well, that does not arise to persecution. But that was a truly isolated event. He had that one horrible incident with the police. He then remained in the country for another year, continued in his political activities, was not disturbed or harassed because of it. And the evidence that his hearing was that, well, fellow classmates threatened that I might be tortured or I might be killed. And the court explained. And this also shows up in the Mitev case, which is cited. They said there's a big difference if it's a co-worker or a classmate or your brother in law who says you're going to get in trouble. You might get killed as opposed to a government official or the secret police who actually have the power to carry that out. Mr. Martinez was threatened with death in the basement of a jail cell being held by police officers on no charges, no warrant. That is a credible threat. And it happened more than once. Thank you. You've saved some time for a vote and we'll hear from you then. So we'll hear from Mr. Hamilton. Thank you, Judge Martin. Morning. May it please the court. Gene Hamilton on behalf of the United States attorney general. You hear me OK. I broke up for a second. I'm sorry. I can hear you. Great. I don't know about my colleagues. Great. Thank you very much. Your honors, the government's position in this case is that there is no basis to disturb the agency's decision below. It's simply the case that this is a situation where the agency made an informed decision based on the record that was before it and determined that the petitioner failed to carry his burden as required by law. In order, his removal from the United States after denying his applications for relief and protection from removal. Mr. Hamilton, the I'll tell you, the problem I'm having is that evidence was introduced that the Cuban government recognized him as a dissident writer. And the immigration judge says that Martinez provided no evidence that the Cuban government recognizes him as an opposition party journalist. Instead, it appears that the respondent is only a private citizen and is not a member of the media. It seems to me that the sort of lurking problem here is in that statement right there, where it appears that the evidence that was presented was not considered. Why? I'll ask the same question of you that I asked of your opposing counsel. Why wouldn't we just remand? Well, thank you for that question, Judge Branch. I think the distinction here is simply a matter of whether or not he is a journalist in the sense that he is a recognized member of the opposition media in Cuba, as opposed to being somebody who is a server by trade, who has written a couple of articles for a magazine under a different name than his real name. I think that that was the basis for the agency's decision below, which was that if he had been doing more, if he had been recognized as being an actual journalist in participating in more activities, writing more articles, doing more things, then I think that certainly that the course point would be well taken. I think, though, in your in your own brief, you cite the evidence that the president of the CDR told Mr. Martinez that he would spend a lot of time in prison and be tortured, quote, if he continued writing for the magazine. So, I mean, the government doesn't dispute that the Cuban government identified Mr. Martinez as a writer for a dissident magazine, do you? Thank you, Judge Martin. Yes, that that is correct. We don't dispute that. The record below shows that the head of the CDR did, in fact, provide a warning of sorts. But again, because he was a dissident writer, I don't know that the record necessarily supports that it was because he was a dissident writer, as opposed to his association with the dissident writers themselves, with the organization. But I mean, that's what I mean. The quote is we're going to you're going to spend a lot of time in prison and be tortured if you continue to write for the magazine. So they I mean, I don't I don't see how you can ignore that. I mean, that they don't say you are associating with writers of this bad magazine. They say you're writing for it. Right. I mean, that's the language you quote in your brief. Judge, that is that is absolutely what the what the record that is the quote that is in the brief and that is what the record below demonstrates. But I believe that the government's position is simply that the identification by the head of the CDR in under the particular facts of this case do not support a finding that he was, in fact, an opposition journalist in Cuba engaged in opposition journalism such that he was persecuted on account of his political opinion. Are you just a follow up? Can I just ask one more question? So the government also acknowledges, as I understand it, that Cuba has a history of oppressing political dissidents. Right. Correct, Judge. OK, thank you. Thanks, Judge. And my question, I guess, is just to follow on. I mean, it just seems to me that you're slicing the bologna or asking us to slice it awfully, awfully, awfully thin, because what you're saying is, sure, he was writing for a dissident magazine, but he wasn't a journalist. I mean, he was I don't know. I mean, what's the spectrum here from a you know, there's a columnist and then there's a freelancer or something. I mean, it's just he's writing for a dissident magazine. Isn't that a journalist by any other names is still a journalist? I mean, is there some statutory definition of journalists that we should be aware of? I just I don't I don't quite understand how it is that we're supposed to parse all this out. Thank you, Judge Newsom, that it's a very important point. And it's a it's a hard point. These are these are difficult facts where the agency had to make a difficult decision based on the facts before it. In a parallel context, you could think of perhaps if you or I was to write an occasional article on an online blog or a Web site, the fact that we do one or two articles for that Web site or for that publication does not render us a journalist. It does obviously indicate our work with that entity, but it does not render us directly a journalist by trade. And I mean, I guess, frankly, I'm just not quite sure about that. I mean, I'm going to plug my son's my 18 year old son has started his own college football related sports blog called Tailgate Talk dot org. And he's not a professional journalist, but I mean, he he writes for that blog and does podcasts. And I think that as an 18 year old, he considers himself a budding journalist. I don't really understand. I don't know, like where along the spectrum do you kind of cut it off? I just don't really understand how that's supposed to be done. Well, well, judge that those are those are great points. I think that the government's position in this case is simply that. The agency below had to make difficult decisions based on the facts that were presented for it, and it determined based on the individualized facts of this case and in this case, the fact that he was not a journalist, that the petitioner did not experience conduct and harm that rose to the level of persecution. Again, I'm reading from the immigration judge's order. And it's it's it says at most this information indicates respondent was a friend of Mr. Valdez or a supporter of the magazine, not that he actively wrote for the magazine. I mean, I just that seemed to just flatly ignore the evidence to me. Well, I don't know that I could characterize that as is flatly ignoring it. But but I believe that the record below shows that the agency took a considered view of the facts of this case and weighed them in a manner that was was not beneficial to the petitioner to his claims. Let's talk about the jobs, if I'm remembering correctly, the IJ only references the loss of one job, but it was I mean, here you've got a guy like he's he's trying to live his life, you know, he he moves, he changes jobs. It seems like the IJ got that wrong as well. I mean, if there's evidence of him losing three jobs, moving around the country to escape persecution, trying to leave the country legally, not being allowed to do so, you know. I mean, the opinion just doesn't recognize any of that. Well, Judge, I believe that the Board of Immigration Appeals, though, in its in its decision recognized his multiple job losses and terminations that that's recognized in their decision, I believe, at page two. It's also there on the Board of Immigration Appeals decision in footnote three, where a petitioner raised the issue earlier petitioners counsel in his argument that the agency didn't adequately consider the persecution in its totality. And that's where in footnote three, footnote two, I'm sorry, not footnote three, footnote two, that the immigration judge actually did view things cumulatively. And so did the board. And that's where the board, the board's decision, of course, you know, affirmed the immigration judge's decision. And I realize that both are under the court's purview in review right now. But the decision of the board is the decision that is principally responsible for this case before the before the court. And I think that the record shows that the board weighed the the evidence of the multiple job losses, as well as the cumulative harm that was testified to in this case and determined that it just simply didn't rise to the level of persecution. What are some examples of the kind of work you understand would have been available to Mr. Martinez? Judge, I don't know that I could I could speculate before you about what kind of I'm asking you to look at the record and tell me. Judge, I really I really don't know much about what he would otherwise be capable of. The record obviously demonstrates that he reflects the fact that he had worked in the restaurant industry as a server. He got fired from three jobs and he got fired from three jobs. That's correct. I can't speculate as to what what other jobs he could conduct in Cuba. Not having expert knowledge of the labor mobility in the Cuban economy. Or what political dissidents are allowed to do as to earn a living in Cuba. All right. I'll leave you alone now. Sorry. Thank you. Well, in some the government's position is that the record below reflects that the facts of this case, this this case is isn't about what the Cuban government does to other other people who are opposition journalists. Doesn't reflect. It's not about what Cuba does to other people. It's just about the facts of this case. And under the facts of this case, it didn't rise to the level of past persecution. He didn't proffer sufficient evidence to show that he had an objective, objectively reasonable fear of future persecution. If he was to be returned to Cuba because his claims for withholding and protection under the cat were based upon the same facts. Our request is that this court dismiss this petition for review. I'm sorry. Deny the petition for review and affirm the decision below. Thank you. Thank you. Yes, your honors. First, I appreciate the questions and then the care with which you've all gone through the record. It's apparent that you're giving this a close look. And my client and I are extremely grateful for that. The judge Newsom's question about, well, what's a real journalist and what's a. Non journalist, if real journalists are entitled to protection and amateur journalists are not. The question is, I think the the key response to that is, well, what is the source of the harassment? If the government began harassing the judge's son or any 18 year old blogger, I think everyone's first inquiry will be would be, well, why? Why is the government harassing him? If a young man is robbed a bank and the government has asked him to account for that. Well, it's clear that that that's reasonable if the government is going after him because they don't like his religion. If the government's going after him because they don't like his football tailgate blog, then there is a problem. There is a fundamental problem with American values and American and American immigration law. You cannot go after people because of their political opinions. And while the government doesn't go around the globe writing every wrong, if someone seeks asylum under a protected class, a protected group and can demonstrate their persecution is connected to their political activity in their home country. Then they are entitled to asylum. And here we feel the evidence is overwhelming that it was the only reason that the government was harming Mr. Martinez and repeatedly harming Mr. Martinez was because of his political journalism. So it does not matter the volume or the extent. I think it's particularly salient point that he was not paid for his work in journalism. And Judge Martin asked, well, what other jobs could he do? Well, he explained in his testimony, I earn money as a waiter. But then I write and I work with this magazine and I do so anonymously because it's extremely dangerous to put your name on something, criticizing the government and a totalitarian regime. So the next logical question is, well, it does. He remained anonymous. Is the government unaware of who he is and what he does? And no reasonable fact finder could say it's still unclear. The government isn't on to him. They're absolutely they're all over him and they're all over him because, as your honor, they told him, stop writing for this magazine or you could get killed. You could disappear. You could be tortured. This was told to him by the head of the Communist local affiliate, the CDR. It was told to him by state agents in a basement prison cell. These are not the people who other courts have looked at threats and said, well, that's different because they don't really have the power to carry it out. He is in the crosshairs of a powerful totalitarian government because of his protected activity. And when the government says, well, it doesn't matter what Cuba does to other people, that's that's incorrect. If there is a pattern in practice of oppressing political dissident journalists, it's absolutely relevant what the government does to other people. And the record here shows even the opinions below show that the U.S. State Department recognizes there's a pattern of practice of severe persecution of political journalists in Cuba. So there is a presumption that he has a reasonable fear of persecution and a well-founded fear of persecution, future fear of persecution if he's returned to Cuba. And I think that the last point I would make is that it's no solution to say, well, he can hide or he can just simply stop being a journalist. And if he just lays low, if he just does what the government tells him, he'll be OK. This court's Kazemzadeh opinion explained in the context of religious persecution, an immigration court had said, well, all the Christians are oppressed in Iran. Many of them just hide. They just practice underground and that gets them by. And there are a lot of Christians who live their lives unmolested by the government. And this court was very clear saying that's not a solution. You don't have to hide your protected status in order to avoid a finding of asylum. Hiding is not a solution. In this case, it's Mood anyway, because he can't hide now. The government has already identified him. It's already on top of him. It's already monitoring him. It's already harassing him. For that reason, he's entitled to asylum. Thank you, Your Honors. Thank you. I will take the case under advisement.